WILLIAM KALIVAS, Plaintiff-Appellant, v. MRS. J. C. HAUCK, Defendant-Appellant, No. 44933—290 S. W. (2d) 94.

Division One, May 14, 1956.

*Ward A. Dorsey* and *Alan F. Wherritt* for appellant.

*John J. Hasburgh* for defendant-appellant; *Watson, Ess, Marshall & Enggas* of counsel.

[96] HOLLINGSWORTH, J.—This is an action for specific performance of a written instrument executed by defendant, Mrs. J. C. Hauck, wherein she granted plaintiff, William Kalivas, an option to purchase a tract of approximately 75 acres of farm land in Platte County, Missouri, upon conditions in said agreement set forth. The trial court found the issues generally in favor of plaintiff, but refused specific performance, and, in lieu thereof, awarded plaintiff damages in the sum of $2,000. Both parties have appealed. Plaintiff says the court erred in refusing specific performance or, in the alternative, if specific performance was properly denied, that the court erred in refusing plaintiff the right to amend his petition to include specific averments of his damage and to direct an inquiry on that issue instead of arbitrarily assessing such damage at the sum of $2,000. Defendant says the instrument constituted at most an agreement to negotiate a contract for the sale of said land and was unenforceable both because it is incomplete and is violative of the statute of frauds, § 432.010 RSMo 1949, V.A.M.S. Title to real estate is involved and jurisdiction of the appeal is vested in this court. Article V, § 3, Constitution of Missouri, V.A.M.S.

Mrs. Hauck, hereinafter called defendant, owned and, with her daughter, Mrs. Olga Bailey, resided upon the farm involved. At sometime prior to the execution of the agreement in question, defendant had "listed" the farm for sale with the Suiter Farm Company, Inc., of Kansas City, Missouri, of which company William L. Suiter was the principal officer and Mrs. Ruth Wood was an employee. Wil-

liam Kalivas, hereinafter referred to as plaintiff, was interested in buying land for development into a residential area. Through Mrs. Wood, he learned of defendant's desire to sell her farm and went to talk with her and view the farm. They had several discussions about the sale of it. During these conversations, both parties learned (1) the purpose for which plaintiff wanted the land; (2) that Mrs. Hauck wanted to reserve from the sale the residence, surrounding outbuildings, and five acres of the land upon which they were situate; (3) that the sale price of the land was $40,000; (4) that a portion of the farm had a crop of corn growing thereon under a sharecrop rental agreement with a nearby farmer, the landlord's share of which would be reserved to defendant; and (5) that there were other matters yet to be agreed to before a sale of the farm could be consummated. Pursuant to the aforesaid conversations, plaintiff prepared and defendant signed the instrument in question, to wit:

"In consideration of the Sum of Two Hundred Dollars paid to me by Wm Kalivas Receipt hereby is acknowledged. I do hereby grant to Wm Kalivas an option to purchase the west half of the Northeast quarter of section 29, twp. 51, rg 33, except Beginning at the Southwest corner of the NE 1/4 of Sec. 29 in Twp, 51 rg 33 and running E with the S boundary line of said 1/4 sec 24 rods thence N 8 rods thence W 24 rods to the W boundary line of said 1/4 section thence S 8 rods to the place of beginning containing one acre and thirty-two square rods. With the exception of 5 acres which will be designated later where house now stands.

"The purchase price is $40,000 (Forty Thousand) in which the Two Hundred is to be applied if this option is used in the next 30 days when it becomes Null and Void if a standard contract of sale has not been signed. This is approximately 75 acres. signed the 14th of July, 1954.

(S) Mrs. J. C. Hauck"

 Defendant was paid the two hundred dollars mentioned in the instrument.

Plaintiff testified: On August 6, 1954, he called defendant and told her that he and his attorney, Ward Dorsey, wanted to confer with her and "write in the terms of the contract". Defendant said she would like to have Mr. Suiter present, whereupon plaintiff called the Suiter Agency. Pursuant to arrangements made with Mr. Suiter, plaintiff and Mr. Dorsey met with defendant and Mrs. Wood at defendant's home on Saturday afternoon, August 7, 1954. Defendant's daughter, Mrs. Bailey, was also present. Prior to that meeting there had been no agreement reached as to or discussion of the terms of the real estate contract. At the meeting, defendant said she wanted the barns included in the five acre tract; that she wanted "possibly to connect on to the gas and water and lights and wanted to connect on to the

streets if it was worked out with the engineers and how it would work out''. There was a discussion as to when the corn crop could be removed and as to ''when [we] would be able to go in and start to try to prepare the land for grading operations.''

''Mrs. Woods brought up the subject she thought we could put down forty thousand dollars with the Suiter Farm at that time, and Mr. Dorsey said that the option didn't state anything about it, * * * that we wouldn't even have to put down any money whatsoever to enter into the real estate contract to be able to examine the abstract.

''Q. Did you or your attorney indicate your willingness to agree to put down any money at the time and sign the real estate contract? A. We did.

''Q. How much? A. Ten per cent.''

Plaintiff further testified: Defendant said nothing in reply to this suggestion. Later on that occasion, defendant said she was glad plaintiff was getting the property: Plaintiff had Mr. Dorsey prepare a sales contract agreement which was submitted to the Suiter Company and by it disapproved. A second contract was prepared and signed by plaintiff. He and Mr. Duffy (associated with Mr. Dorsey) took it, with a certified check for $3,800, to defendant on Friday, August 13th, and tendered both to defendant, which she declined, saying that Mr. Suiter had advised her to do so. Both the check and the contract were left in the home and an executed copy of the contract was sent to the Suiter Agency. Plaintiff further testified that at that time he was in a position to pay the balance of the purchase price in cash if the title to the property was good. On cross-examination, plaintiff said he meant that he ''had access to forty thousand dollars'', meaning, he said, ''I had ten thousand dollars and three of my partners had the other ten thousand dollars apiece.''

On further cross-examination, plaintiff denied he told Mrs. Hauck prior to execution of the option agreement that he was unable to pay the entire purchase price. He admitted, however, that after it was signed he told her he was not prepared to pay the purchase price and suggested to her several different ways in which the deal might be financed, including a suggestion that she join in the development enterprise, all of which she refused; admitted that prior to his call upon defendant on August 7, 1954, ''there had been no agreement reached between [them] as to the terms of the real estate contract'', but insisted that they did come to an agreement on that date; admitted that the contract was to include all of the terms discussed and agreed upon at the meeting; and that a part of the terms ''agreed to be put in the real estate contract'' pertained to roads and utilities on the acres that were to be conveyed under the contract; admitted that in a deposition priorly given by him he had stated that ''the down payment was never mentioned. * * * I don't believe we ever discussed it.'' But, on further cross-examination, he also testified:

928

"Q. Let me ask you this question with reference to your deposition. "Question: Prior to the date of 'the option agreement, Mr. Kalivas, did Mrs. Hauck make any statement to you concerning the forty thousand dollars purchase price being put into escrow?

"Answer: With Mrs. Ruth Wood, real estate agent.

"Question: When was it to be done?

"Answer: When the real estate contract. was agreed upon."

At the trial, however, he denied that it was ever agreed that the $40,000 was to be put in escrow and stated that there was never any mention of an escrow of the $40,000.

The first contract tendered by plaintiff to defendant contained clauses reading as follows:

"Also to be excluded from the West Half of the Northeast Quarter of Section 29, Twp. 51, Rge. 33 is a tract containing 5 acres of land on which is located the home and out-buildings of the seller. The boundary lines of said tract are to be determined by a survey to be prepared at the expense of the seller.

\* \* \* \*

"The seller shall have the right to connect onto and tie into all roads and utilities which the buyer may in the future establish or cause to be furnished to the above described tract of land hereby conveyed."

There was also a clause to the effect that the buyer should have possession on date of delivery of waranty deed, subject to the right of seller's tenant to harvest the corn crop thereon, but in no event should the right of the tenant to come upon the premises extend beyond November 1, 1954. (It does not reserve to defendant the landlord's share of said corn.)

A further clause provides:

"The purchase price of said land to be paid to the seller by the buyer is Forty Thousand Dollars ($40,000) to be paid by the buyer as follows: ............... Dollars at the signing of this contract, the receipt whereof is hereby acknowledged by the seller and which is deposited with the Suiter Farm Company, 3810 Broadway, Kansas City, Missouri, as a part of the consideration of the sale; the balance to be paid in cash on delivery of deed as herein provided."

Plaintiff admitted that the amount of the down payment was omitted from the contract in accordance with his instructions to his attorney.

The second contract, a copy of which is attached to the petition as the instrument upon which plaintiff bases his action, was tendered to defendant on August 13, 1954. It was signed by plaintiff. It reserved to defendant the landlord's share of said corn crop, and further provided: "The purchase price is Forty Thousand and no/100 dollars, $40,000.00, which the buyer agrees to pay as follows: Four Thousand and No/100 Dollars, $4,000.00 at the signing of this contract, the receipt whereof is hereby acknowledged by the seller and which is

deposited with Suiter Farm Company, Inc. 3810 Broadway, Kansas City, Missouri, as part of the consideration of the sale; the balance to be paid in the following manner: Thirty-Six Thousand and No/100 Dollars, $36,000.00, cash on delivery of deed as herein provided, and - - -'' The only reference to the five acre tract to be reserved to defendant is: ''[E]xcept a tract of five acres surrounding the home and out-buildings of the seller the boundary lines of which tract will be later designated from a survey''; and there is no provision whatever as to any right granting defendant access to roads, streets or utilities.

Genevieve Weir, a realtor of 16 years experience, residing in Parkville, Missouri, and holding positions of trust in Platte County and the Missouri Real Estate Associations, testified that there were three printed forms of real estate sales contracts in general use in Platte County, which are very similar in content. She identified three of such forms and stated that the ''Demaree'' form was most commonly used in ''our area''.

(The form used in preparing the contract upon which plaintiff seeks specific performance is not the ''Demaree'' form, but is one used by the Kansas City Real Estate Board.)

William L. Suiter, called as a witness for plaintiff, testified that within the 30 day period fixed by the option agreement the first of the proposed contracts was presented to his office and that prior to the date it was presented he, or his corporation, acting as agents for defendant had signed a contract with one Mr. Webb, of the Metropolitan Savings & Loan Association, for the sale of the farm to him, for the sum of $42,000, conditioned upon failure of consummation of the Kalivas option agreement; and that the Webb contract provided for a payment of only $2,000 upon its execution; which sum is on deposit with the Suiter Company; that he advised defendant not to sign the first contract tendered by plaintiff because it was not signed by plaintiff and no money had been tendered under it; and that the second contract was left at his office by an attorney for plaintiff, but defendant had not sought his advice as to whether she should sign it.

Defendant testified: When the option agreement was signed, it was agreed between her and plaintiff that the entire $40,000 was to be deposited in escrow with the Suiter Agency. On this occasion, plaintiff told her he did not have the money and wanted to know if she would let him build roads and curbing without any money being paid down. She told him, ''No''. He later wanted her to let him build houses on the farm and give her part of the money. Again she said, ''No''. Then he asked if she would give him a year's option if he put up $5,000, to which she said, ''No''. He then asked about buying only ten acres, which she declined to consider.

Defendant further testified: When plaintiff and Mr. Dorsey came out to discuss the terms of the contract referred to in the option agreement, Mr. Dorsey and Mrs. Wood did most of the talking. They

agreed the contract would provide that defendant would have the right to connect the five acre tract reserved by her with the utilities, roads and water. Plaintiff was to pay $40,000 in escrow within 30 days. No money was tendered defendant when the first contract was proffered to Mr. Suiter and it was not signed by plaintiff. When the second contract was brought to her home by plaintiff and Mr. Duffy, defendant was in the kitchen. She came into the room where they were. They had placed the contract and $3,800 check on the table and defendant knew nothing about it until they had left. Her daughter told her it did not mention the utilities or water, and "so I couldn't sign it". She is willing to return the $3,800 and, perhaps, the $200.

On cross-examination: She never saw printed forms of real estate contracts, such as those exhibited to her by counsel, before the "one they brought". She complained to plaintiff several times that the first contract did not obligate him "ever [to] build roads or bring water up there". Plaintiff has never asked her to return the $200 or the $3,800 check, and she has never offered to do so. She at all times knew about the contract made with Mr. Webb.

Mrs. Olga Bailey corroborated in general the testimony given by her mother, the defendant, and, in further detail testified: Her mother told plaintiff that the acreage she was to convey to him would surround three sides of the five acres reserved by her and that in the deal to be completed, he must put the utilities and roads there and agree that "we would have a right and a way to get to these roads and utilities and that we wouldn't be shut off from them, when it was platted and divided". On August 13th (when the second contract was brought to defendant's home), Mr. Duffy and plaintiff handed witness the contract and check, both of which she examined. After doing so, she said to them, "There is nothing in the contract respecting the roads or the utilities", to which Mr. Duffy replied, "That will have to be written in." She told them there was nothing to sign and returned the check and contract to Mr. Duffy, who, in turn, delivered them to plaintiff with instructions to lay them upon the table, which plaintiff did.

[100] On cross-examination, witness said her mother always insisted upon the payment of the entire purchase price within 30 days and that the purpose of the option agreement was to give him that much time to raise the money.

Mrs. Ruth Wood testified: Plaintiff asked witness to help him raise $40,000. She tried to do so, was unsuccessful and so advised him. Defendant repeatedly told plaintiff he would have to pay the $40,000 before the expiration date of the option; it was to be placed in escrow with Suiter. Plaintiff never made any definite reply to these demands. Defendant also told plaintiff she would require an easement on the property so that she would be able to "tie in to the

property'' he was purchasing and that unless he so agreed, she would not sell. Plaintiff said ''it was agreeable with him * *''.

Mr. Duffy testified in rebuttal: He went to defendant's home on August 13, 1954, to deliver the second contract and the $3,800. He was advised by Mrs. Bailey that defendant was not well. He discussed the contract with Mrs Bailey. Defendant then came into the room and he again went over it with her. In both instances, there was a refusal to sign the contract and it was placed on the table.

The trial judge wrote a lengthy ''Memorandum Opinion and Judgment''. He found that subsequent to the signing of the option agreement, to wit, on August 7, 1954, plaintiff met, with defendant and her agent in defendant's home and discussed preparation of ''a standard real estate sales contract'', but that ''no agreement was reached as to the contents of the sales contract''; that ''the parties did discuss the question, of roads and utilities, but the evidence is unsatisfactory * * *''. The opinion then sets forth at length quotations from many sources relating to specific performance and the discretionary right of the trial court to refuse specific performance of a valid contract and to award damages in lieu thereof. He found that the option agreement was ineptly drawn but was sufficient to meet the demands of the statute of frauds; that ''defendant's hands here are not very clean'', because of the contract she made with Webb. The opinion then recites, ''I find the issues for the plaintiff'', but it makes no finding as to the essential facts in controversy. The opinion further recites: ''As already indicated, the Plaintiff ought to prevail, but if Specific Performance were decreed the Court would have to determine what five acres was excluded and would have to supervise the survey. In addition, the Plaintiff admitted that if and when he developed the tract and when the utilities were brought in and the roads built, these developments would be available to the defendant.** * * I find that because some of the terms of this Option Agreement are not clear, specifically the five-acre exclusion, a Court would be required to supervise this matter for some time in the future, if Specific Performance were decreed. It is therefore a proper case on the facts for the Court to deny Specific Performance and award the Plaintiff a money Judgment for damages which will, I believe, give prompt and complete equity to both parties.

''Now, the defendant has received $200 from the Plaintiff. I assume that the $3,800 certified check, which was not cashed, is no longer cashable. The defendant has already contracted to sell this property for $42,000, which is $2,000 above the contract price to Plaintiff. I therefore find for the Plaintiff in the sum of $2,200 and costs.'' Judgment was rendered accordingly, with a further adjudication voiding the $3,800 check in possession of plaintiff.

In determining the issues in an equitable action for specific performance, we weigh the evidence and make our own findings,

deferring, however, when we may consistently do so, to the findings of the chancellor on disputed issues of fact that turn upon the credibility of witnesses who appeared before him. Glauert v. Huning, Mo. Sup., 266 S.W. 2d 653, 662. But, as stated, the chancellor's memorandum makes no specific finding of any completed agreement reached by the parties. To the contrary, he finds that "some of the terms of [101] this option agreement are not clear, specifically the five-acre exclusion * * *".

We are unable to attach any significance beneficial to plaintiff in the phrase in the option agreement relating to a standard contract of sale. As the phrase is used in the agreement, we construe it to mean, as did the parties, that a binding and finally enforceable contract yet remained to be negotiated; and that, if it be not negotiated and signed within 30 days, the option, by its terms, became void. The Supreme Court of Illinois considered a somewhat similar situation in a case wherein the trial court had denied specific performance. In that case, London v. Doering, 325 Ill. 589, 156 N.E. 793, a preliminary agreement describing properties to be exchanged and naming the purchase price, contained the further provision, loc. cit. 794: "Frank Waisman, broker, authorized to bring the two parties together for signing a regular real estate contract within three days." In disposing of the appeal, that court affirmed the action of the trial court, saying, loc. cit. 795: "It appears to us no other understanding of the contract can be arrived at than that the parties were to come together again for the purpose of making a definite agreement as to the terms and conditions of the exchange of properties." To the same effect is Lippman v. Featherston, 247 Mich. 153, 225 N.W. 489, wherein the contract provided that the premises were to be sold under a "uniform standard land contract governing the sale of farms".

We therefore agree with the decision of the trial court refusing specific performance, but we are convinced that the judgment must be reversed in its entirety because of our conclusion that no final, complete, valid and binding agreement whereby defendant was obligated to consummate the option agreement was ever reached.

A court of equity cannot make a contract for the parties. Terry v. Michalak, 319 Mo. 290, 3 S.W. 2d 701; P.R.T. Investment Corp. v. Ranft, 363 Mo. 522, 252 S.W. 2d 315. To make a contract there must be a meeting of the minds of the parties. Negotiations, proposals and preliminary steps leading up to, but not becoming a part of the actual final agreement, do not constitute the contract. The proposition or propositions suggested by the one must be accepted as tendered; and if the acceptance omits, enlarges or modifies the terms of the proposition made, then neither party is bound. Dobbins v. City Bond & Mortgage Company, 343 Mo. 1001, 124 S.W. 2d 1111, 1115; In re Franz's Estate, Mo.Sup., 242 S.W. 2d 490, 494.

Despite plaintiff's testimony at the trial that there was no mention of escrow of the $40,000 purchase price, the record definitely reflects that defendant was insisting, even prior to the signing of the option agreement, that the entire purchase price be assured to her before she entered into any contract binding her to a sale of her land. And, although plaintiff testified that at the time he tendered the second contract on the last day of the option period (August 13, 1954) he had "access" to $40,000, he admittedly did not have it when he signed the option agreement, and, during the attempts to negotiate a completed contract, he repeatedly importuned defendant to enter into some sort of a modified agreement that would enable him to obtain title to her land or part of it without paying the entire purchase price of $40,000. (Such conduct on his part may explain the contract made by defendant with Webb.) Furthermore, when the parties met on August 7th and defendant demanded that a "down payment" of $40,000 be provided for in the contract, plaintiff demurred and offered a down payment of $4,000, and there is no evidence that defendant then or thereafter agreed to that proposal, other than the testimony of plaintiff that during the negotiations of that date defendant said she was glad he was getting the property. However, it is worthy of note that the contract tendered defendant as a result of the August 7th negotiations, at the express direction of plaintiff, contained no provision for any down payment whatever; clearly indicating that even plaintiff [102] did not understand that he and defendant had agreed to a $4,000 down payment. And, when the second contract finally was tendered, it provided only for a down payment of $4,000 (including the $200 paid upon execution of the option) and that the balance of the purchase price was to be paid upon delivery of the warranty deed, without contractual proffer of escrow or other assurance whatsoever given defendant that plaintiff had succeeded in obtaining "access" to $40,000 with which to pay the purchase price, as defendant had unremittingly demanded he must make available to her during the option period. We are convinced there was never any meeting of minds as to the method and time of payment of the purchase price.

Furthermore, the first proposed contract provided that the boundary lines of the five acre tract were to be determined by defendant and also gave her the right to connect on to all roads and utilities which the "buyer may in the future establish * * *". This was not a compliance with defendant's demand that plaintiff obligate himself absolutely to provide such connections (which, of course, would also require him to proceed with the development project he had described to defendant when he offered to purchase her farm). The second proposed contract provided only that the lines of the five acre tract "will be designated from a survey". (Query: By whom and at whose direction and cost would the survey be made?) Neither did

934

it contain any provision whatever giving defendant access to roads or utilities, as plaintiff qualifiedly admitted he had agreed to do. (In this connection, it is of no aid to plaintiff that, at the trial, he stated his willingness to make available to defendant any roads and utilities in existence if and when he developed the tract.) Clearly, there was never any meeting of minds on these matters during the thirty day period fixed by the option. Obviously, all were matters of grave significance to defendant.

Neither can defendant's rights be denied to her upon any theory of "unclean hands". She has not invoked equity. Rather does she stand, as she has a right to stand, upon the strict terms of the instrument by which plaintiff seeks to establish her liability.

Our conclusion is that the option agreement, in and of itself, was never an enforceable agreement and that it became void when the parties failed to complete a sales contract within 30 days. It follows that defendant has no right to retain either the $200 or the $3,800 check delivered her by plaintiff. The judgment is, therefore, reversed with directions that, upon deposit by defendant of said sum of $200 and the $3,800 check or the proceeds thereof with the clerk of the circuit court for delivery to plaintiff within 15 days after issuance of the mandate herein, this cause be dismissed with prejudice to and at the cost of plaintiff; and that defendant failing to deposit said $200 and said check or its proceeds within the time aforesaid, judgment for the total of said sums be rendered in favor of plaintiff against defendant, which shall constitute a lien upon defendant's said land, for which special execution may issue, together with all costs of this action. All concur.