**J. M. ROBERTS, d/b/a Roberts Realty Company, Plaintiff-Respondent,**

v.

**Clara GILCHRIST, Thomas P. Gilchrist, Mary K. Pincetl and Gladys Genive Gilchrist, Defendants-Appellants.**

No. 24229.

Kansas City Court of Appeals.

Missouri.

Dec. 6, 1965.

John P. Ryan, Kevin Kirwan, Kansas City, for appellants.

Robert J. Coleman, Kenneth E. Bigus, Kansas City, for respondent.

SAMUEL A. DEW, Special Commissioner.

Plaintiff brought this action in two counts. Under Count I he seeks determination of the rightful ownership of $500 deposited with him by defendants Richard Chamberlain and Lawrence Ferns, copartners, doing business as the Commercial Laundry & Dry Cleaning Machinery Sales. The deposit had been made in connection with a written proposal procured from them by the plaintiff for a lease of certain real estate belonging to the remaining defendants herein. Count II is based upon an alleged implied contract between plaintiff and defendant owners of the real estate to pay the plaintiff a commission to obtain a tenant to lease the property mentioned. A previous judge of the court, on a prior motion, had heard and disposed of Count I, awarding the $500 to the copartnership. Count II was thereafter tried without a jury and the court found in favor of plaintiff, awarding him a commission of $4,740, with interest accrued of $912.45. From this judgment, defendant owners have appealed. There was no appeal from the disposition of Count I.

Hereinafter, any reference to the defendants by that designation is intended to apply to the appellant owners, the admitted joint owners of the real estate in question, to-wit: Clara Gilchrist, Thomas P. Gilchrist, her son, Mary Pincetl, her daughter, and Gladys Genive Gilchrist, former wife of Thomas P. Gilchrist.

In Count II the plaintiff, a real estate operator, alleged an implied contract between him and the defendants to obtain a lessee for their real estate located in Kansas City, Missouri, at 7122 Prospect Avenue, upon a ten year lease at a rental of $750 per month net to them, and to pay the plaintiff a commission out of any excess rental, over $750 a month, which he might obtain; that plaintiff procured a written proposal from the above named copartnership for a ten year lease at $790 per month and he obtained a deposit of $500 from the proposed lessees, who were ready, able and willing to execute such proposed lease, whereupon defendants became obliged to pay plaintiff his commission. It was averred that said lease was never executed, either because of breach on the part of the copartnership, or on account of the delay on the part of the defendants in accepting and submitting a lease in accordance with the proposal. The prayer was for a judgment of $4,740, as a reasonable compensation, with interest and costs.

Attached to the petition as plaintiff's Exhibit "A" was a copy of the proposal referred to, signed on its margin by the copartnership, by Richard Chamberlain, later introduced in evidence. It was addressed to the plaintiff, was dated February 2, 1961, and requested plaintiff to submit its terms to the owners of the above property. It proposed a ten year lease, effective June 1, 1961, with an option to the lessees for an extended period of five years, the rental to be $94,800, payable $790 per month in advance. It described the nature of the occupancy and recited the deposit enclosed of $500 to the plaintiff to be returned if the lease was not negotiated. It reserved the right of the parties to approve the final form of the lease and contained these words: *"This offer expires 12:01 p. m. February 6, 1961."* (Italics supplied.) Spaces appeared at the end to indicate approval or rejection by the owners.

The copartners, Chamberlain and Ferns, filed a separate joint answer to plaintiff's petition on June 7, 1961, including a counterclaim as to Count I. They denied any breach of obligation on their part respecting a proposed lease, and prayed judgment that they were the rightful owners of the $500 deposit. As to Count II, they as-

serted that they "were ready, willing and able to enter into a lease with the rightful owners of the real property allegedly described in Count I of plaintiff's petition until 12:01 p. m. February 6, 1961", but denied that they "were able, ready and willing to enter into a lease thereafter." They affirmatively alleged as a fact that they were not able, ready or willing to enter such a lease since that date.

The complete record of the adjudication of ownership of the $500 deposit on prior motion by another judge is not before us, but the trial court was advised by counsel for the plaintiff that the prior judge "had decided that and the $500 was returned to the Laundry Sales Machinery Company."

By their separate answers to Count I, defendants Thomas P. Gilchrist and Clara Gilchrist admitted executing a lease along with Mary Pincetl to the property described, but alleged insufficient knowledge of the remainder of the petition to form a belief as to the truth thereof. In her separate answer, Gladys Genive Gilchrist, former wife of Thomas P. Gilchrist, attacked Count I as insufficient to state a cause of action, and, as to Count II, admitted the joint ownership of the property and denied generally the remaining allegations of the Count.

Mary Pincetl, in her separate answer, admitted the joint ownership as pleaded in Count I; denied that she employed the plaintiff to get a tenant to lease the property upon the terms pleaded, or that she agreed to pay the plaintiff any commission out of rentals exceeding $750. She alleged that she received a telephone call from the plaintiff in early February, 1961, requesting an exclusive listing of the property for lease which she refused, but told him the property was available for lease. She pleaded that he then came to her home and requested her to sign plaintiff's Exhibit "A", a proposal for a lease, which she refused to sign, telling him that she would have to consult her attorney. She further

pleaded that on March 31, 1961, she did sign the proposal and signed a lease to the proposed lessees, which were delivered to her by plaintiff's attorney, and which she had returned to plaintiff. She stated in her answer that she was informed by plaintiff a week thereafter that he was having a little difficulty in getting the proposed tenant to sign the lease. She further alleged that plaintiff had urged her to take the $500 deposit early in February if she would sign the proposal, which she declined to accept, explaining that she would have to consult her attorney. She stated that the proposed lease was later signed by her and the other defendants. As to Count II, her answer was in the nature of a general denial.

Plaintiff's evidence tended to show that on February 2, 1961, he and his employee Robert Sweniger, saw a "For lease" sign on the building in question, then occupied by the Kroger Grocery Company, which sign also contained a telephone number; that they drove to their office and Mr. Sweniger called the number. A lady answered. He asked her if she was the owner of the property where he had seen the sign, and she "indicated" that she was. She then gave her name, said she was the owner and that the property was for lease. She discussed the rental rate, stating that it would have to be $750 per month net, and any commission would have to be paid out of any rental obtained in excess of that amount, the lease to be for a term of at least five years.

Regarding the telephone conversation above mentioned, witness Sweniger was asked:

"Q. Now, didn't she tell you that she was one of the owners of the building? Isn't that the conversation?

"A. She said it was a family affair.

"Q. She told you it was a family affair? A. Right.

"Q. Did she give you the names of all the owners of the building? A. No, sir.

"Q. You knew that there were other people involved in it, though? A. Well, it was just a general statement, yes, sir."

Plaintiff's further evidence was that in the evening of that same day, February 2, 1961, "as a result" of the information so obtained, plaintiff and Sweniger procured from Chamberlain at his residence, his signed proposal in behalf of his company, later introduced in evidence, and his deposit check for $500; that both then went to Mrs. Pincetl's home the next morning, Friday, February 3, 1961; that they did not then ask her for the legal description of the property nor the names of the joint owners, nor did they offer her the $500 check, but informed her of it. They did not see Mr. Gilchrist or his mother while there and never saw defendant Gladys Genive Gilchrist. Mrs. Pincetl told them on that occasion that she wanted to talk to her attorney, and discuss the lease and the financial condition of the proposed lessees, but she made no objections to the proposed terms of the lease, if accepted. She did not sign the proposal, which was left with her.

The plaintiff testified that while he did not discuss the ownership with Mrs. Pincetl when presenting the proposal, she was the owner "so far as he knew." He said that on March 13th or 14th, 1961, he took the proposed lease to her, met her mother and brother and was told by them of the joint ownership and the names of the owners, not mentioning Gladys Genive Gilchrist. Thomas Gilchrist asked that the lease be left so that he might look it over and discuss it with their attorney. They made no objections at that time to any of the terms of the lease. Meanwhile, he said, Mr. Chamberlain had not withdrawn his offer.

Plaintiff's further evidence was that considerable delay occurred in the drawing of the lease, two sets being drawn by counsel due to corrections; that a suit had been pending by Gladys Genive Gilchrist to establish her interest in the property in which suit her signature was obtained under stip-ulation filed, and the signed lease was delivered to plaintiff on April 14, 1961. The plaintiff then requested the proposed lessees to sign the lease, which request they denied and demanded the return of the $500 deposit.

In behalf of defendants, Mary Pincetl testified that on account of the illness of her mother and brother they were living with her during the period with which we are here concerned; that she and they and Gladys Genive Gilchrist, were the joint owners of the property involved. She stated that on February 2, 1961, Mr. Sweniger called by telephone and asked if she was the owner of the property advertised for lease where he had seen the sign. She said she replied that she was "one of the owners." (Counsel for plaintiff, in his opening statement, said such was her reply). She said Mr. Sweniger came out to her home the next day with the proposal and that she explained to him that she could not sign it alone, that the owners would have to be consulted, and would want to consult their attorney and investigate the proposed lessees. She refused to sign the proposal at that time, but did sign it along with the lease about March 30, 1961, and delivered the same to plaintiff. She failed to indicate either space for approval or rejection on the proposal. She said the lease had never been sent back to the defendants by plaintiff. Mr. Sweniger had told her he was having a little difficulty in getting the proposed lessees to sign the lease. He later told her they had refused to do so.

Mrs. Pincetl further testified that after the proposal was left with her she explained to her mother and brother about it and about the discussion relating to a commission; that later, when the plaintiff and Mr. Sweniger brought out the lease they introduced them to her mother and brother. She denied that anything was said to her then about the proposed lessees "being about to back out" if the matter were further delayed.

Thomas Gilchrist testified that when plaintiff brought the proposal to his sister's home on February 3, 1961, plaintiff came up to the witness's bedroom; that witness was then ill after long confinement in various hospitals and had undergone several operations; that his mother, age 75 years, was confined to her bed, having just returned from the hospital after a gall bladder operation; that he did not talk with the plaintiff; that he never employed the plaintiff as his agent. He admitted signing the lease about the middle of the following April, 1961. He explained that during his absence, his mother had looked after their property, but since her illness, his sister was looking after it, and had advertised it for lease following the tenancy of the Kroger Grocery Company expiring June 1, 1961. He recalled that when plaintiff brought the lease out, plaintiff told him he was trying to get a tenant for the property, to which the witness made no response. He said he knew that if the lease was accepted, there would be a commission to be paid the agent.

A request for a finding of facts having been made, the court found that plaintiff was a licensed real estate broker; that the property involved was jointly owned by the defendants; that the defendants advertised it for lease; that there was an implied contract of employment of plaintiff to find a tenant for the property; that defendants were willing to pay plaintiff a commission for an acceptable lease; that defendants Clara and Thomas Gilchrist and Mary Pincetl knew that plaintiff was a broker and was attempting to find a lessee; that Gladys Genive Gilchrist relied on the other defendants to rent the property and had no objection to the employment of an agent; that plaintiff procured a tenant who was ready, able and willing to lease the property and was acceptable to the defendants; that a reasonable commission on a ten year lease at $790 per month was $4,740; that plaintiff demanded his commission on May 4, 1961 and was entitled to that amount, with interest at 6 percent from that date.

The court's findings of the law in the case were that plaintiff was employed as agent by the defendants; that he was entitled to a commission from all of the defendants in the amount of $4,740, with interest thereon at 6 percent from May 4, 1961, of $912.45. Judgment was entered accordingly.

Defendants' first point of error, in substance, is that the court, in finding that there was an implied contract of agency between the plaintiff and the defendants, failed to distinguish between the conditions existing under and during the term of the written proposal and the situation of the parties from and after the proposal had expired. The defendants had asked for a finding "that the plaintiff presented an offer dated February 2, 1961, which was not executed before the expiration date." It will be recalled that the court made no finding as to the written proposal or its terms, or its specified expiration at 12:01 p. m. February 6, 1961.

There must be borne in mind several basic principles of law which apply in such cases as the one at bar. The general rule is that " * * * if a broker procure a purchaser who is ready, able and willing to buy on the seller's terms, the broker is entitled to his commission whether or not the sale is consummated." Kyle v. Kansas City Life Ins. Co., 356 Mo. 331, 201 S.W.2d 912, 913; Chamberlain et al. v. Amick, Mo.App., 210 S.W.2d 528, 529, 530. This law applies to leases as well as sales. 12 C.J.S. Brokers § 85a, p. 191. The agency need not be in writing but may be implied. 12 C.J.S. Brokers § 13, p. 35.

The trial court, in finding that plaintiff had produced a tenant, who was ready, able and willing to lease defendants' property and was acceptable to defendants, presumably assumed the binding effect and sufficiency of the proposal and disregarded

its brief and abrupt duration, and its effect on plaintiff's duty thereafter to provide a tenant ready, able and willing to execute the lease, or the court ignored that circumstance as of no consequence in determining the plaintiff's performance. In so doing we are of the opinion that the court erred.

In Point II the defendants claim that the plaintiff failed to prove that he produced a tenant ready, able and willing to make the lease. Referring to the proposal they maintain that even if it were otherwise sufficient, its limited duration deprived the defendants of a reasonable time to investigate the financial ability of the proposed lessees, the nature of their occupancy, their personal traits and the genuineness of their signatures, and the like. They point out that the plaintiff had been informed of the fact that there were several joint owners, only one of whom they had contacted, and that she did not represent the others as their agent; that Mary Pincetl had told him and Mr. Sweniger that the family would have to be consulted as to any lease on the property; that a reasonable time would be necessary to consult their attorney to investigate the financial ability of the proposed lessees and their type of business.

The proposal was obtained on the evening of February 2, 1961. It was presented to Mary Pincetl the next morning, Friday, February 3. With Saturday and Sunday intervening, the express provision of the proposal gave defendants until 12:01 p. m. on Monday next to sign and accept its terms. It was not signed by them at that time and was left in Mrs. Pincetl's possession.

■■■ Had Mrs. Pincetl signed the proposal at any time during its fleeting duration, she could not have complied with it since, so far as the proof shows, she had no authority to bind the other joint own-

ers, nor reasonable time to obtain such authority. Nor could she alone have enforced the proposal, for the same reason. Neither could the proposal be enforced by or against the other joint owners, not being parties thereto. Of these facts plaintiff was aware, having been told of the joint ownership, and he is presumed to have known that a reasonable time would be required to effect a proper acceptance.

It is said in 12 C.J.S. Brokers § 85b, pp. 194, 195:

"Although it is not necessary that the broker produce a purchaser known to the owner to be able, ready, and willing to execute the contract, the owner is entitled to a reasonable opportunity for investigation as to the customer's ability to comply with the contract, * * *."

Certainly it cannot be maintained that defendants, even if otherwise bound, had impliedly contracted with the plaintiff to procure a tenant on terms that would preclude their reasonable opportunity to investigate the proposed tenancy. If an offer can be so limited as to time for investigation, it could be limited to a matter of hours.

That the proposed lessees ceased to be ready, able and willing to make a lease after and beyond 12:01 p. m. Monday, February 6, 1961, is definite and certain. Not only did the proposal specifically so provide, but they so declared in their subsequent letter to plaintiff refusing to execute the lease, and also pleaded the same in this case wherein the court ordered their deposit to be returned. For a ruling of this court on such express limitation, see Sharp Bros. Contracting Co. v. Commercial Restoration, Inc., Mo.App., 334 S.W.2d 248, 252, quoting 17 C.J.S. Contracts § 51b, p. 714:

"An offer comes to an end at the expiration of the time given for its

acceptance, a limitation of time within which an offer is to run being equivalent to the withdrawal of the offer at the end of the time named."

See also 12 Am.Jur., Contracts, par. 56, p. 547; Kalivas v. Hauck, 365 Mo. 923, 290 S.W.2d 94.

The result is that as of Monday, February 6, 1961, at 12:01 p. m., there is no proof that plaintiff had procured a tenant for the defendants, ready, able and willing to execute a lease. Consequently, for proof of such performance of a broker's duties thereafter the plaintiff must rely on the evidence of his transactions subsequent to that date.

■ Defendants' Points III and IV are deemed repetitious and fully disposed of under Points I and II. The fact that after the termination of the proposed lessees' offer by their own specification and without fault of the defendants, as we have found, the plaintiff continued to negotiate with defendants, and the fact that defendants co-operated and supplied the necessary signatures to the lease on or about April 14, 1961, and delivered same to plaintiff, did not relieve plaintiff from his duty to produce a tenant ready, able and willing to accept it, which, as the evidence showed, the plaintiff failed to do. Under the law and the evidence in this case, plaintiff's claim for commission cannot be sustained.

The judgment should be reversed. The Special Commissioner so recommends.

The foregoing opinion of SAMUEL A. DEW, Special Commissioner, is adopted as the opinion of the Court, and the judgment is reversed.

CROSS, P. J., and HOWARD, J., concur.

BLAIR, J., not participating.