**Alfred W. MUELLER, and Al Mueller Realty Company, Plaintiffs-Appellants,**

v.

**John J. RUDDY, and Ralph H. Slavens, and L. K. Wood, Comprising The Missouri Real Estate Commission, Defendants-Respondents.**

No. 42039.

Missouri Court of Appeals,
Eastern District,
Division Four.

April 14, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 15, 1981.

Application to Transfer Denied
July 14, 1981.

2. For a thorough treatment of the law regarding gas explosions, see Annot., 41 A.L.R.3d 782 (1972).

Whalen, O'Connor, Danis & Tobben by David O. Danis, Daniel G. Tobben, Samuel B. Murphy, Jr., St. Louis, for plaintiffs-appellants.

Bushmann, Neff & Gallaher by Eugene G. Bushmann, Jefferson City, Jerry Short, Asst. Atty. Gen., Jefferson City, for defendants-respondents.

SATZ, Judge.

This is an appeal from a decision of the circuit court affirming an order of the Missouri Real Estate Commission (Commission). Appellants are Alfred W. Mueller (Mueller) and Al Mueller Realty Company (Realty Company). The Realty Company's real estate license is dependent upon Mueller's license.

The Commission filed a two-count petition with the Administrative Hearing Commission, charging Mueller, and, in turn, the Realty Company, with violating certain provisions of the Real Estate Agents and Brokers Act, Chapter 339 RSMo 1969.[1] In Count I, the Commission alleged that Mueller was engaged by Transamerica Insurance Company (Transamerica) as an agent to sell a house for Transamerica and, as Transamerica's agent, Mueller fraudulently concealed from Transamerica an offer on the house and Mueller's status as the actual purchaser of the house from Transamerica. In Count II, the Commission charged Mueller with violating § 339.150 RSMo 1969. The Commission alleged that Mueller compensated unlicensed sales persons for selling real estate for him. The Hearing Commissioner (Commissioner) found Mueller and the Realty Company guilty on both counts. His decision was referred to the Commission, and the Commission revoked the real estate licenses of Mueller and the Realty Company. The circuit court affirmed the Commission's order. We affirm the judgment of the circuit court.

On appeal, appellants raise 10 main points and multiple subpoints. To address these points, we excerpt without quotation marks and paraphrase, in part, the pertinent findings of the Commissioner's Findings of Fact.

Alfred W. Mueller is a licensed Missouri Real Estate broker. Al Mueller Realty Company is a holder of a current real estate corporation license which is dependent upon the broker's license of Alfred Mueller. In June of 1977, Transamerica acquired the ownership of some residential property on Blow Street in the City of St. Louis. Two local officials of Transamerica were to dispose of the property: Charles W. Haury, a claims representative, and his immediate superior, a branch manager, Richard Boll. An attorney recommended Boll and Haury engage Mueller as a real estate agent to sell the property. In late June of 1977, both Haury and Boll had phone conversations with Mueller during which each asked Mueller to represent Transamerica in the sale of the property. Mueller agreed to do so.

[1]. Apparently, the proceeding was initiated and processed pursuant to §§ 161.252 et seq. RSMo 1978. The Real Estate Commission initiates the action before the Administrative Hearing Commission. §§ 161.272 and 161.282. A Hearing Commissioner makes Findings of Fact and Conclusions of Law § 161.292, which then serve as the basis for the initiating Real Estate Commission to order appropriate disciplinary action. § 161.292. All statutory references are to RSMo 1978, unless otherwise indicated.

Later in June, Haury spoke again with Mueller. Mueller recommended that Transamerica change locks on the house. The locks were changed and a set of keys were delivered to Mueller. Within a week after the delivery of the keys, Mueller called Haury to tell him the house was in very bad condition and it would cost between $4,000 and $5,000 to recondition it for sale. Mueller also spoke with Boll by phone during the week of July 5th and told him essentially the same story. Mueller told Boll that he would try to interest a couple of contractors in the property if Boll was not interested in repairing the property. In the first week of July, Haury and Boll conferred and decided to sell the house without repairs. Haury called Mueller to inform him of that decision. Three to four days later, Mueller phoned Haury and told him that the best price he, Mueller, could get for the house was $6,500. On July 7th or 8th, Mueller phoned Boll, told him that only one contractor showed any interest in the house and also told him the best he, Mueller, could get from that contractor was $6,500. Shortly thereafter, Boll and Haury conferred again and decided to sell the house for $6,500 because they believed that was the best price Mueller could get. Around the middle of July, Haury called Mueller and told him to sell the house for $6,500. Mueller did not ask to buy the property himself nor did he ask permission to sell the property to someone in his office.

In the latter part of June, 1977, a young couple, Robert Knittel and his fiancee (Knittels) saw the property on Blow Street with Mueller's real estate sign in the front yard. They obtained Mueller's phone number from the sign and, some time during the last week of June, Mr. Knittel called Mueller's office. Knittel spoke with an employee of Mueller, Kathy Freiner. Freiner was not a licensed real estate saleswoman. Freiner told Knittel the owners had not set a price on the property and he would not be able to see the property until the price was set. During the first two weeks of July, Knittel talked to Freiner asking about the price and she responded that they were getting closer to establishing a price. On July 20, 1977, Freiner showed the Knittels the property. Freiner met them at the house, announced that she was working for Mueller and that she represented the owners, who remained unnamed. After a tour of the house, the Knittels signed an "offer-to-purchase" contract on a standard form prepared by Freiner. The purchase price was $18,500. H. J. Merschmann, a licensed salesman employed by Mueller, was listed as seller on the contract. The Knittels paid $100 to Freiner as earnest money when they signed the contract on July 20th. After the sale was completed, Freiner received $300 from Mueller for her services in selling the property. Freiner testified that the property was listed on the board at Mueller's office, indicating it was for sale.

On July 21, 1977, Mr. Windmueller, a salesman in Mueller's office, prepared an "offer-to-purchase" contract on the Blow Street property. The contract listed H. J. Merschmann as the purchaser.[2] The contract, a standard form, provided that Mueller would receive a 6 percent commission and also required the offer be accepted by July 23, 1977. Mueller changed the date of the contract to read July 11, 1977, before Windmueller took the contract to Transamerica's office. When Windmueller presented the contract for Boll's signature, he did not tell Boll or Haury that the buyer, Merschmann, was Mueller's uncle and was a salesman in Mueller's office. After signing the contract, Boll asked who was to receive the earnest money and he was told Mueller would keep it as agent until the final sale was consummated. Boll and Haury were not told at the time they signed this contract that two days earlier, on July 20, 1977, Mueller had obtained an offer to purchase the property for $18,500.

2. Merschmann was listed as purchaser on both the copy of the contract from the files of the title company and the copy of the contract from Transamerica's files. However, the copy of the contract from the files of the title company also had an arrow drawn from the name Al Mueller Realty Co. to the line designated for the purchaser. The arrow does not appear on the copy from Transamerica's files.

On August 26, 1977, Merschmann made a written assignment of his interest in the Blow Street property to Mueller for $1.00. The assignment was witnessed by Mueller's secretary.

At the time of the closing, neither Boll nor Haury was available, to sign for Transamerica, as the grantor. Another employee, Benno Leyrer, signed the deed in behalf of the company. Leyrer knew nothing about the terms of the sale except that the price was about $6,000. Only one deed was executed. Transamerica was the grantor and the Knittels were the grantees. However, there were two sets of closing statements. The first set contained a statement showing Al Mueller Realty Company as the purchaser. The first closing statement was dated September 20, 1977, and reflected a sale price of $6,500. The second set of closing statements was dated September 19, 1977. They reflect the same property but show a sale price of $18,500. The statement for the seller is in the name of Alfred W. Mueller, president of Al Mueller Realty Company and was signed by Mueller. The Knittels were the purchasers.

The Commissioner found that Mueller became Transamerica's agent to sell the Blow Street property, and, as an agent, Mueller, and, in turn, the Realty Company, fraudulently concealed from Transamerica Mueller's identity as the purchaser of the property[3] and the offer on the property. He also concluded Mueller improperly compensated Freiner for her services.

■ Appellants first attack the sufficiency of the evidence. To determine the merits of this attack, we review the findings and decision of the Commissioner not the judgment of the trial court. *See Ingram v. Civil Service Comm'n of St. Louis*, 584 S.W.2d 633 (Mo.App.1979). We defer to his views on the credibility of witnesses and we view the evidence and all reasonable inferences in the light most favorable to his findings. *E. g., Dittmeier v. Missouri Real Estate Commission*, 237 S.W.2d 201, 203 (Mo.App.1951). We may not substitute our judgment of the evidence for that of the Commissioner and we may not set aside his decision unless it is not supported by substantial evidence, or unless it reflects an abuse of discretion or is not authorized by law. *E. g., Missouri Real Estate Comm'n v. Steger*, 509 S.W.2d 47, 49 (Mo.1974).

Appellants' attack on the sufficiency of the evidence is two-pronged. Appellants argue there was insufficient evidence to show Transamerica had authorized either Boll or Haury to hire Mueller as an agent; and, if this authority existed, appellants argue, there was insufficient evidence to show an agent/principal relationship was created. These arguments are not persuasive.

■ Contrary to appellants' first contention, there was evidence to show Boll had authority to hire Mueller as an agent for Transamerica. Mueller states that neither Boll or Haury had authority to sign a listing agreement. However, the transcript pages to which he refers do not support this statement. Indeed, Boll testified that he probably could have signed a listing contract. Admittedly, no listing contract was signed. However, a written contract is not needed to create an agent/principal (broker/client) relationship. *See Roberts v. Gilchrist*, 397 S.W.2d 705, 709 (Mo.App.1965). More important, Boll did testify he had final responsibility for the disposal of the Blow Street property. Boll, in turn, authorized Haury to locate a real estate agent. Neither Boll nor Haury was questioned about the extent of his authority on cross-examination. Absent any conflict on this issue, any burden the Commission may have had was satisfied by Boll's testimony.

■ Appellants' second contention is also contradicted by the record. There was substantial evidence to show Mueller was hired as an agent. Brokers normally act as agents for their clients. *White v. Miriam Realty Co.*, 547 S.W.2d 184, 197 (Mo.App. 1977). Thus, a broker/client relationship and its creation is normally no different

3. From the operative facts, the Commissioner inferred that Merschmann, Mueller's uncle, purchased the property as a straw party for Mueller.

than an agent/principal relationship and its creation. *See, e. g., Utlaut v. Glick Real Estate Co.*, 246 S.W.2d 760, 763 (Mo.1952). The relationship is created by consent. One person manifests his consent that another shall act on his behalf and be subject to his control. The other person manifests his consent to so act. Manifestation of consent may be by conduct. *Id.* at 763. This manifestation depends upon what the parties say and do and not necessarily what they subjectively intend. *Groh v. Shelton*, 428 S.W.2d 911, 916 (Mo.App.1968); Seavey, *Agency*, § 20, p. 37 (1964). The conduct of the parties in the present case manifested reciprocal consent creating an agent/principal relationship.

■ Initially, Boll and Haury instructed Mueller to find a buyer for the Blow Street property. Reasonably interpreted, this instruction to Mueller, a real estate broker, was an authorization to act as an agent to sell the property. The record shows Mueller so construed the instruction, accepted the authorization and acted as an agent. Haury testified that, during a phone conversation, Mueller agreed to represent Transamerica. Mueller took possession of the keys to the property; he solicited offers on the property; his realty sign was placed in front of the property; the property was listed on the listing board in his office; and his employee showed the property to prospective purchasers. Reasonably construed, the acts are a collective manifestation of consent completing the agency relationship. *See Utlaut v. Glick Real Estate Co., supra* at 763; *Seavey, supra* at 37. Furthermore, at the hearing, Mueller admitted he acted as an agent for Transamerica. Arguably, his admission encompasses assumptions about the law. However, his statement was not his opinion on an abstract question of law; rather, it was his application, as a real estate broker, of agency standards to the facts of this case. As such, it suggests what he thought the facts were, and, because he is a party to this action, the factual underpinning of his statement should not be ignored merely because his statement indicates his assumption about the law. *See Grodsky v. Consolidated Bag Co.*, 324

Mo. 1067, 26 S.W.2d 618, 621 (1930); McCormick, *Evidence*, § 265, p. 633 (1972). Mueller did state he terminated the agency relationship before any duty to disclose arose. However, Boll and Haury testified that Mueller did not renounce his agency. The Commissioner chose to believe Boll and Haury. We find no reason to disturb the Commissioner's determination that Mueller was Transamerica's agent.

■ Appellants next complain the Commissioner erroneously "found appellant fraudulently concealed material information from Transamerica . . . while acting as their agent because this finding is not supported by substantial and competent evidence." This complaint mixes fact findings with conclusions of law. Appellants really contest the findings of fact upon which the conclusions of law are based. This complaint is without merit.

Appellants contend the finding of Mueller's failure to disclose the true identity of the purchaser was based solely on the testimony of Haury which was so "contradictory" that it was not credible. Contrary to this contention, Haury and Boll both testified that, at the time the "offer-to-purchase" contract was presented for Transamerica's acceptance, they were unaware the purchaser was a salesman from Mueller's office and that he was Mueller's uncle. According to their testimony, the true identity of the purchaser was learned only after the subsequent sale of the property to the Knittels had been completed. Admittedly, Mueller's testimony contradicted the testimony of Boll and Haury. The Commissioner chose to believe Boll and Haury and the reasonableness of this belief was not vitiated by any real contradiction in Haury's testimony. Appellants' examples of conflict in Haury's testimony are either facially not contradictory or are easily reconcilable.

Appellants also contest the finding that Mueller failed to disclose the Knittels' offer to Transamerica. Mueller does not dispute that he knew of the Knittels' offer before the written contract between Mueller's uncle and Transamerica was signed. How-

ever, Mueller contends he entered into an oral agreement with Transamerica to sell the property for $6,500 some two weeks prior to receiving the Knittels' higher offer, and Mueller also contends he informed Transamerica he would be the purchaser. As noted, Boll and Haury testified that Mueller did not disclose he would be the purchaser. The Commissioner chose to believe them rather than Mueller. Furthermore, Haury's authorization to Mueller to sell the house for $6,500 was based upon Mueller's representation that $6,500 was the best price Mueller could get for the house. Once the Knittels expressed an interest in or made an offer on the house, Mueller, as an agent, had the continuing duty to disclose the interest and offer to Transamerica. We see no reason to disturb the findings of the Commissioner.

Nor do we find a reason to disturb the conclusion of the Commissioner that Mueller fraudulently concealed this information in violation of the relevant statutes. Mueller was Transamerica's agent and, thus, had a fiduciary duty to Transamerica. *See Travagliante v. J. W. Wood Realty Co.*, 425 S.W.2d 208, 212 (Mo.1968). Mueller breached this duty by failing to disclose he was buying the property himself through a straw party. *See Utlaut v. Glick Real Estate Co., supra* at 763. Mueller also breached this duty by failing to disclose to Transamerica the offer made by the Knittels. *See Dittmeier v. Missouri Real Estate Comm'n*, 237 S.W.2d 201, 207 (Mo.App. 1951). Either of these breaches of duty would constitute a violation of § 339.100 RSMo 1969, justifying disciplinary action by the Real Estate Commission. *See* § 339.100 RSMo 1969. It is not necessary to establish common law fraud. Boyle v. Missouri Real Estate Comm'n., *537 S.W.2d 603, 612 (Mo. App.1976)*.

Next appellants challenge the finding that Mueller paid fees which he received from the sale of real estate to a person not holding a real estate license. The relevant statute provides:

"No real estate broker shall pay any part of a fee, commission or other compensation received by the broker to any person for any service rendered by such person ... unless such person is a licensed real estate salesman ...." § 339.150 RSMo 1969.

Appellants apparently do not dispute the fact that Mueller paid an unlicensed person $300 when the subject property was sold for services rendered showing the property and dealing with the buyer. Rather, appellants contend this payment was outside the scope of the statute. They argue that Mueller received no fee or commission for the sale of the property and thus could not pay a part of such fee to anyone. We disagree.

The provisions of Ch. 339, including § 339.150 RSMo 1969, were enacted to protect the public from fraud and incompetence. *Gilbert v. Edwards*, 276 S.W.2d 611, 617 (Mo.App.1955). They will be strictly construed against anyone claiming to be exempt from the provisions. *Id. See also Miller Nationwide R. E. Corp. v. Sikeston Motel Corp.*, 418 S.W.2d 173, 177 (Mo.1967).

Obviously, the rationale behind § 339.150 RSMo 1969 is to protect the public from dealing with unlicensed salespeople by taking away the pecuniary incentive for unlicensed people to sell to the public. Typically remuneration for selling would come out of a share of a broker's commission. Here, however, income was produced because of the profit on resale. Arguably, the Commissioner's findings and conclusion of an agency relationship between Transamerica and Mueller necessarily imply Mueller is holding this profit in a constructive trust for Transamerica, and, therefore, in a strict literal, legal sense Mueller has not received "compensation" from the sale of the Blow Street property. However, Mueller, cannot use his own wrongdoing to avoid the sanctions of this statute. Thus, we find this profit is "other compensation" within the meaning of § 339.150 RSMo 1969. Mueller, while acting as an agent for a third party, paid an unlicensed person for services rendered selling real estate. This payment was made from the only compensation Mueller received on the sale, and such payment is prohibited by § 339.150 RSMo 1969.

Appellants' next contentions center on alleged procedural irregularities which, they contend, require reversal. Appellants cite *Rose v. State Bd. of Healing Arts*, 397 S.W.2d 570 (Mo.1965) and argue their procedural due process rights were violated because there was an "appearance of unfairness" in the proceedings. Appellants misconstrue the *Rose* case. In *Rose*, the court simply stated the circumstances there belied "even an appearance of unfairness leading to a denial of due process." *Id.* at 575. Of course, appellants are entitled to procedural due process. This requires a meaningful opportunity for appellants to be heard, which includes the right to an impartial decision maker, the right of appellants to know the claims against them and the right to confront and cross-examine opposing witnesses and to rebut their testimony with appellants' own evidence. *Tonkin v. Jackson County Merit System Comm'n.*, 599 S.W.2d 25, 32–33 (Mo.App.1980). Since decisions rendered by an administrative body are presumed to be valid, appellants carry the burden of overcoming this presumption by establishing unfairness in the procedure. *See Moore·v. Bd. of Educ. of Special School Dist.*, 547 S.W.2d 188, 191–192 (Mo.App. 1977). Appellants have not sustained this burden.

First, appellants charge the chairman of the Commission, L. K. Wood, with personal bias against them. Citing the record, appellants contend Wood attempted to withhold the real estate license of a witness until she would make a statement against appellants and contend Wood threatened to invoke his fifth amendment privilege instead of disclosing a fact crucial to appellants' defense. We have read the record. It does not support appellants' contentions. Apparently, prior to becoming chairman of the Commission, Wood did refer to Mueller as a "crook." However, Wood only participated in the decisions to initiate an investigation of appellants and to file a complaint with the Administrative Hearing Commission. After the process was initiated, appellants' hearing was conducted by a Commissioner whose impartiality is not questioned. Wood only participated in the hearing as a witness called by appellants. Moreover, he did not participate in the Commission's subsequent decision to revoke appellants' license. Thus, regardless of the inferential weight given to Wood's isolated characterization of Mueller, there is no showing of any improper influence on the adjudicatory processes of the Commissioner or of the Commission. Absent such evidence, we will not reverse. *See Moore v. Bd. of Educ. of Special School Dist.*, 547 S.W.2d 188, 191–192 (Mo.App.1977).

Appellants next argue it was the Commission's practice to give notice prior to filing charges with the Administrative Hearing Commission. Appellants attack the Commission's failure to follow this practice in the present case. According to the record, this practice was followed in only 40 percent of the cases in which the Commission filed charges. At best, it is questionable whether the Commission's omission in the present case was a deviation from the norm. In any event, appellants received a copy of the charges and, thus, "notice" of the charges prior to the hearing before the Commissioner. That is all the notice due process requires. *See Tonkin v. Jackson County Merit Selection System Comm'n., supra* at 32–33.

Appellants next complain about the conduct of James McKee, an investigator for the Commission. Prior to the hearing before the Commissioner, McKee told Mueller that he had "enough evidence to turn [the case] one way or another" and offered to sell Mueller the evidence. Subsequently, at his disposition, McKee asserted his fifth amendment privilege against self-incrimination and refused to answer questions about this conversation with Mueller, a conversation with L. K. Wood, and a conversation with Eugene Bushmann, attorney for the Commission. Appellants filed a combined motion to dismiss or strike the Commission's petition or to stay the proceedings against them indefinitely on the grounds that McKee's refusal to answer constituted a violation of appellants' right to discovery guaranteed by the due process clauses of

the United States and Missouri Constitutions and by § 536.073 RSMo 1978. The Commissioner overruled this motion. Appellants contend this ruling was error.

Appellants' argument is based upon an extension of the rule enunciated in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1962). The underlying principle in *Brady* was the avoidance of an unfair trial of the accused. *Id.* at 87, 83 S.Ct. at 1196. The court stated a prosecutor should not be "an architect of a proceeding that does not comport with the standards of justice," *Id.* at 88, 83 S.Ct. at 1197, and the court condemned the prosecutor's suppression of evidence which was material to guilt or punishment. *Id.* at 87, 83 S.Ct. at 1196. Appellants would extend the logic and enlarge the application of this rule. Appellants argue the Commission here was in position similar to the position of the government in *Brady.* McKee was an investigator for the Commission and, therefore, appellants reason, his conduct was the Commission's conduct. McKee claimed to have exculpatory information, and, at the same time, he blocked appellants' access to this information by his refusal to testify about that information at his deposition. Thus, appellants argue, McKee's refusal, in effect, was suppression of exculpatory information by the Commission. The present case is distinguishable from *Brady* and appellants' requested dismissal or indefinite stay of these proceedings was not warranted.

For our purposes here, we assume without deciding that the *Brady* rule is applicable to a civil administrative proceeding.[4] Nonetheless, application of the precise rule articulated in *Brady* would not require a dismissal here. Appellants have not established that any exculpatory information was available to the Commission and was suppressed by it. *See Brady v. Maryland,*

*supra* at 87, 83 S.Ct. at 1196; *see, e. g., State v. Greenlaw,* 593 S.W.2d 641, 643 (Mo. App.1980). Moreover, we have no convincing evidence that any relevant information was withheld. Here, we have only McKee's claim that he had information favorable to appellants. At best, the reliability of this claim is questionable. In his deposition, McKee denied he had any information which might benefit appellants. In addition, Mueller testified McKee showed him the alleged exculpatory information and it "wasn't worth 20 cents to [him]."

More important, this alleged information is not in the Commission's files or under its control. The Commission turned over to appellants all of McKee's reports. This is not the case, for example, where a Commissioner has claimed to have exonerating information. Admittedly, McKee was employed by the state and worked at the direction of the Commission. However, McKee cannot sensibly be equated with the Commission nor can his actions sensibly be considered to be the actions of the Commission. The Commission cannot compel McKee to forego his constitutional privilege not to incriminate himself. Thus, his assertion of his privilege renders any information protected by his assertion as unavailable to the Commission as it is to appellants. In short, McKee's assertion of his privilege against self-incrimination was not and cannot be equated to the state's suppression of evidence. Rather, his action is more closely akin to a potentially exculpatory witness asserting the privilege in a criminal case. The assertion creates a tension between the witness's privilege and the accused's right to discovery. When this tension arises, the witness's privilege prevails and the defendant must defend himself without the benefit of the witness's testimony. *See State v.*

---

4. Appellants have cited no authority which extends the *Brady* rule to an administrative proceeding. Our research has disclosed no Missouri case to support this extension. However, *McCormick* states, with supporting cases, that "exculpatory information in an agency's possession or file data which may aid respondent's preparation or presentation of his case must be disclosed by the agency. The alternative is to drop the prosecution against the respondent. Anything less would violate the commands of procedural due process which every adjudication must observe." McCormick, *Evidence* § 355 at 853 (1972), and cases cited at 853, n.8.

*Wilkinson*, 606 S.W.2d 632, 636 (Mo.banc 1980).[5]

Appellants' next contention is also based upon the assumption that McKee's conduct is imputable to the Commission and his invocation of the fifth amendment was, in effect, the Commission's invocation. Therefore, appellants reason, the proceedings should have been dismissed because the Commission, as the moving party, had, on the one hand, initiated the proceedings, and, on the other hand, had refused to reveal information which might be detrimental to its claim. *See Geldback Transport Inc. v. Delay*, 443 S.W.2d 120, 121 (Mo.1969); *Franklin v. Franklin*, 365 Mo. 442, 283 S.W.2d 483, 486 (1955). Appellants' reliance on *Geldback* and *Franklin* is misplaced. The Commission is a party to the action but, as demonstrated, McKee is not the Commission. He will not benefit from the litigation and, indeed, he has not sought relief through the administrative or judicial process. *Geldback Transport Inc. v. Delay, supra* at 121; *Franklin v. Franklin, supra* at 486.

■ Appellants next contend they were precluded from cross-examining McKee at trial and, therefore, their due process rights and statutory right to cross-examination were violated. We disagree. Appellants called McKee as a witness. In response to an inquiry, McKee indicated it was his intention to invoke his fifth amendment privi-

lege "with regard to any question concerning this investigation .... " The Commission's counsel then proceeded to question McKee and, using McKee as a sponsor, he offered McKee's deposition into evidence. Appellants' counsel stated he had no objection because he believed McKee was now the Commission's witness.[6] After admission of McKee's deposition into evidence, appellants' counsel again questioned McKee and McKee again invoked his fifth amendment privilege. Appellants' counsel had no objection to the admission of McKee's deposition, and he did not ask the Commissioner to strike the deposition when McKee again invoked his fifth amendment privilege after the deposition was admitted into evidence. This complaint is without merit. *See, e. g., State v. Battles*, 607 S.W.2d 723, 728 (Mo. App.1980).

Appellants also complain about "the inclusion by McKee in Knittel's statement [taken by McKee] that Kathy Freiner had told the Knittels that the seller's name was Smith when this was not true." However, appellants make no further argument to explain why this alleged irregularity prejudiced them. Assuming this was a procedural impropriety, we will not reverse absent a showing of prejudice. *See Coffman v. Faulkner*, 591 S.W.2d 23, 26 (Mo.App.1979).

■ Next appellants complain the Commission failed to disclose to them nu-

5. Appellants maintain that the rationale of *Brady* as developed in dicta in *Earl v. U. S.*, 361 F.2d 531, 534 (D.C.Cir.1966) and *People v. Sapia*, 41 N.Y.2d 160, 391 N.Y.S.2d 93, 359 N.E.2d 688 (N.Y.1976) support their position. We find no support for appellants in either case. In *Earl*, the court held the judiciary had no power to order the executive branch to grant immunity to a potentially exculpatory defense witness and also held the refusal of the executive branch to grant such immunity did not deprive the defendant of a fair trial. *Earl v. U. S., supra* at 534. Here, not only would this court lack the power to compel a grant of immunity, the Real Estate Commission would lack the authority to make such a grant. The only language in *Earl* which might be considered remotely favorable to appellants appears as dicta in a footnote where the court indicates due process might be lacking if the state were to grant immunity to a prosecution witness, yet refuse it to a defense witness. *Id.* at 534, n.1.

That situation is not present in or analogous to the instant case. Similarly, in *People v. Sapia, supra*, the court of appeals of New York held a defendant was not deprived of due process by the failure of the state to grant immunity to a potentially favorable witness. *Id.* 359 N.E.2d at 692. It indicated the result might be different if the witness were a law enforcement agent. *Id.* Again, however, we note that the Real Estate Commission cannot grant "immunity" to McKee. The Commission is not blocking appellants' access to McKee. Hence, the principles of fairness suggested in dicta in the immunity cases are not applicable.

6. At this point counsel engaged in a discussion as to whether McKee became the Commission's witness or remained appellants' witness. His status was never resolved, but it is not determinative of this issue.

merous exhibits and witnesses required by a pretrial order. It is questionable whether this point has been preserved for review. First, we have not been supplied with a copy of the pretrial order to which appellants refer; thus, analysis of whether disclosure was required is impossible. The Commission contends no pretrial order was violated. Second, appellants have not indicated in their point or their argument which exhibits and what testimony were improperly admitted into evidence. We are not required to search the record to find support for appellants' point. *Brewer v. Blanton*, 555 S.W.2d 381, 386 (Mo.App. 1977); *Dubail v. Green Trails Plaza*, 587 S.W.2d 934, 941 (Mo.App.1979); Rule 84.04. In their Statement of Facts, appellants do refer to specific witnesses and exhibits which they claim were not disclosed. Even if this information is the subject of appellants' complaint and even if it should have been disclosed, appellants have still failed to show reversible error in the Commission's subsequent use of these witnesses and exhibits at trial. The Commissioner, like a trial judge, has discretion in deciding whether to impose sanctions for failure to comply with his orders for discovery. *See Schmelig Construction Co., Inc. v. Missouri State Highway Comm'n.*, 543 S.W.2d 265, 270 (Mo.App.1976). Appellants have failed to show an abuse of this discretion and resulting prejudice and, thus, have failed to establish reversible error. *See Coffman v. Faulkner, supra* at 26; *Kennedy v. Tallent*, 492 S.W.2d 33, 39 (Mo.App.1973).

None of appellants' alleged irregularities was an impropriety which violated appellants' rights. Thus, there is no necessity to consider the cumulative effect of these alleged errors. *See Baker v. Ford Motor Co.*, 501 S.W.2d 11, 18 (Mo.1973).

█ Finally, appellants contend the Commissioner erred in sustaining objections to various questions appellants asked on cross-examination. They contend these rulings denied them their statutory right to examine witnesses. See 536.070(2). The Commissioner, like a trial judge, has wide discretion in determining the scope of cross-

examination, *e. g., Cash v. Bolle*, 423 S.W.2d 743, 746 (Mo.banc 1968), and we examine each of appellants' complaints in the light of this fundamental principle.

█ First appellants contend they should have been allowed to impeach the testimony of Haury with allegedly inconsistent deposition testimony. The deposition testimony was not admitted, but it is in the record in the form of an offer of proof. We have examined the testimony and see no prejudice to appellants in its exclusion. We find its inclusion would have no effect on the outcome of the hearing. Furthermore, following the offer of proof, Haury testified on the record in the same manner as he testified in the excluded deposition testimony. Thus, the information which appellants desired to place before the Commissioner was in fact before him.

█ Appellants next complain it was error for the Commissioner to reject certain testimony as hearsay. In this instance, the witness was a closing clerk at the title company where the closing on the Blow Street property took place. On cross-examination, appellants' counsel asked her why the closing file on the property was taken out of the normal channels two days after the closing. The Commissioner sustained the Commission's objection on the ground the question called for hearsay. As an offer of proof, the clerk testified Eugene Larson, an officer of the title company, told her in late September the file was being taken out of normal channels because there was going to be an investigation involving the file. Apparently, appellants believe this testimony was admissible to show inconsistencies with Larson's prior testimony. Larson had testified he believed the first time he knew there was to be an investigation was sometime after November 17th. However, his testimony was equivocal and indicated uncertainty as to the dates involved. Larson stated that it was possible the file was taken out of the normal course of business two to three days after the September 20th closing because of the pending investigation. Any real inconsistency is minor. Furthermore, appellants have not demon-

strated the materiality of the date Larson learned of the investigation. Even if this ruling of the Commissioner were improper, appellants have not demonstrated any prejudice worked by the exclusion of the clerk's testimony. *See Coffman v. Faulkner, supra* at 26.

 Appellants called the Commission's attorney, Eugene Bushmann, as a witness. Appellants complain about the Commissioner's limitation of their examination of Bushmann. Apparently, in an attempt to show bias on the part of the Commission, appellants' counsel asked Bushmann a series of questions about certain of his conversations with Kathy Freiner. The Commissioner sustained objections to these questions on the ground of relevancy. In the offer of proof, Bushmann testified he did not recall any of these conversations. Testimony is relevant only if it tends to prove or disprove a fact in issue. *Charles F. Curry and Co. v. Hedrick*, 378 S.W.2d 522, 536 (Mo.1964). Bushmann's proffered testimony, reflected in the offer of proof, did not tend to prove or disprove any bias. Thus, we find no error in the Commissioner's ruling. Also, appellants contend the Commissioner erred in not compelling Bushmann to testify about a particular conversation he had with McKee, the Commission's investigator. Bushmann stated he believed McKee was calling him as a personal attorney seeking legal advice. From the general tenor of the conversation, Bushmann concluded that McKee believed he was relating information to Bushmann "in the nature of a client to an attorney." Although not certain, Bushmann believed an attorney-client relationship was created and he asserted the privilege in order for the Commissioner to make the ultimate determination. On this record, the Commissioner declined to order Bushmann to testify. At the trial level, Bushmann may have had the burden of showing McKee's conversation with him was privileged. *E. g., Hutchinson v. Steinke*, 353 S.W.2d 137, 144 (Mo.App. 1962). In this Court, appellants have the burden of establishing there was insufficient evidence to support the Commissioner's ruling. *Id.* at 144. Appellants have not sustained this burden. At the hearing, appellants objected to the Commissioner's ruling, but they laid no additional foundation, by offer of proof or otherwise, showing the particular conversation between Bushmann and McKee was not privileged. Absent this showing, we are unable to find the Commissioner was shown a proper alternative to his ruling and, therefore, on the present record, we cannot say he ruled improperly. *See, e. g., Hutchinson v. Steinke, supra* at 144; *cf. State v. Battles*, 607 S.W.2d 723, 727 (Mo.App.1980).

Judgment affirmed.

SMITH, P. J., and SIMON, J., concur.