**STATE of Missouri ex rel. Clifford E. KELLEY, Complainant-Appellant,**

**v.**

**SHERWOOD MEDICAL INDUSTRIES, INC., Respondent.**

**No. 51380.**

Missouri Court of Appeals,
Eastern District,
Division One.

April 14, 1987.

Motion for Rehearing and/or Transfer Denied May 12, 1987.

Application to Transfer Denied June 16, 1987.

William L. Webster, Atty. Gen., Louren R. Wood, Asst. Atty. Gen., Jefferson City, for complainant-appellant.

Stella Ting, New York City, Stanley Garber, St. Louis, for respondent.

SATZ, Presiding Judge.

This is an employment discrimination case. Clifford E. Kelley (Kelley) was discharged by Sherwood Medical Industries, Inc. (Sherwood). The hearing examiner found Sherwood discharged Kelley because of race and, therefore, concluded Sherwood discriminated against Kelley, in violation of § 296.020 RSMo.1978. The Missouri Commission on Human Rights (Commission) adopted the hearing examiner's Findings of Fact and Conclusions of Law and awarded Kelley back pay. The circuit court reversed. The Commission appeals. We affirm the circuit court.[1]

We review the findings and decision of the Commission not the judgment of the trial court. See, e.g., Mueller v. Ruddy, 617 S.W.2d 466, 472 (Mo.App.1981). We defer to the Commission's determination of credibility, and we view the evidence and all reasonable inferences in the light most favorable to its findings. Id. We may not substitute our judgment of the evidence for that of the Commission, and we may not set aside its decision unless it is not supported by substantial evidence, or unless it reflects an abuse of discretion or is not authorized by law. Id.

The Commission found the following facts: Kelley, a black male, was employed by Sherwood from February, 1977 until his dismissal in December, 1980. In mid-De-

---

1. Kelley did not intervene in this case. The Attorney General presented the evidence to support a discriminatory firing to the hearing examiner. For convenience and clarity, we will refer to the moving party as Kelley rather than the Commission.

cember, 1980, a white, female coemployee, Bonnie Schank Sollars (Sollars), came to Kelley's work area to confront him about a rumor he had allegedly started concerning Sollar's "involvement" with another employee, Jack Gertsch. After exchanging heated words, Kelley and Sollars went to look for Gertsch in another part of the plant. They found two other employees, Judy Garrett (Garrett) and Kathrin Gresham (Gresham), who were working in a room adjacent to Gertsch. Garrett went to get Gertsch, came back without him and said Gertsch did not want to get involved. Throughout this time, "only a few minutes", Kelley and Sollars continued to argue. Sollars responded to one of Kelley's comments by telling him to keep his "black mouth shut". Kelley reacted to this remark by hitting Sollars in the face, cutting her lip and causing it to swell. Gresham and Garrett corroborated this description of the incident.

Sollars reported the incident to her supervisor, Ramona Clark (Clark). Clark observed Sollars' lip was swollen and had been bleeding. Sherwood's Industrial Relations Manager, James Taylor (Taylor), was told of the incident and began his investigation the following day. Taylor interviewed Sollars, Kelley, Clark, Gresham and Garrett. Kelley admitted to Taylor he had hit Sollars. Taylor incorporated most of these facts into his written investigation report.

About a year before the Kelley/Sollars' incident, Sherwood changed its "no-fighting" rule from suspension to discharge of those who violated the rule. Kelley knew the change in the rule was in effect when he hit Sollars. Taylor discharged Kelley because he was fighting. Taylor did not discharge Sollars but gave her a written reprimand for leaving her department without permission.

In March, 1981, a white male, John Davis (Davis) and a white female, Anna Blessing (Blessing), were involved in an incident. Blessing supposedly related to coemployee a remark allegedly made by Davis about a friend of Blessing. Another employee asked Davis about the alleged remark. Davis confronted Blessing, became angry, called her a "lying bitch", grabbed her arm and pulled her toward him. Because of the pull, Blessing "tripped over" a hydraulic lift on the floor, which "injured" her ankle. Davis pulled Blessing with sufficient force to propel her about eight feet away against a "skid". Her arm was bruised where Davis grabbed her, and her hand was scratched from hitting the "skid". Her "injured" ankle kept her off work for four days. Davis was given a three day suspension, but no disciplinary action was taken against Blessing. Taylor recommended Davis' suspension rather than discharge because Davis pulled Blessing and did not strike her "intentionally", in a "malicious manner".[2]

The Commission then determined whether these facts proved discrimination by using the three-step process required for proof of discriminatory treatment under § 296.020 RSMo 1978. Under this process, (1) the employee has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. The employee meets this burden by establishing (a) he is within the class sought to be protected by the statute, (b) he was discharged, and (c) there was some evidence from which it could be inferred that race was a factor. (2) If a prima facie case is established, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the discharge. (3) If the employer meets this burden, the burden again shifts to the employee to establish by a preponderance of the evidence that the reason given by the employer was not the true reason, but was a pretext for discrimination. *See, e.g., Missouri Commission on Human Rights v. St. Louis County Board of Election Commissioners,* 714 S.W.2d 873, 875–76 (Mo.App.1986); *see also, Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253–54,

---

**2.** Kelley's theory of discriminatory treatment originated as a discrimination claim limited to the Kelley/Sollars incident. At the time of the hearing, however, Kelley apparently shifted the basis of his claim and, thus, elicited evidence of the Davis/Blessing incident.

101 S.Ct. 1089, 1093, 67 L.Ed.2d 207, 215 (1981). The employee retains the burden of persuasion throughout and must establish the employer's proffered reason was not the true reason for the discharge. *Missouri Commission on Human Rights* at 876; *Burdine* 101 S.Ct. at 1093.

The Commission concluded Kelley established his prima facie case by showing: (a) he was black and, therefore, was protected by the statute; (b) he was discharged by Sherwood; and (c) Sollars, a white female, received only a written reprimand as a result of the Kelley/Sollars incident, but Kelley was discharged. The latter facts, the Commission reasoned, show a causal connection between race and Kelley's discharge.

Shifting its focus to Sherwood, the Commission concluded Sherwood established a legitimate nondiscriminatory reason for discharging Kelley. Sherwood proved its "no-fighting" rule was in effect at the time of the incident; the rule was to protect employees; and Kelley knew about the rule at the time he hit Sollars.

Refocusing on Kelley, the Commission concluded he established this nondiscriminatory reason was a pretext. More specifically, the Commission concluded Sherwood did not apply its "no-fighting" rule as strictly to whites as to blacks. The Commission reached this conclusion through more elaborate reasoning: Sherwood's reason for instituting the "no fighting" rule was to protect employees. Sherwood, however, did not define the term "fighting" and, thus, left the decision to Taylor's "subjective evaluation" of whether a particular incident constituted a fight. Since Sollars was only reprimanded and Kelley was discharged, Taylor "apparently" distinguished verbal confrontation from physical force, evaluating the latter but not the former as a "fight".

However, the Commission continued, Taylor failed to apply his criterion to the Davis/Blessing incident. Taylor was aware Davis, a white male, used physical force against Blessing. Taylor differentiated the Davis/Blessing incident, from the Kelley/Sollars incident because, Taylor said, in the Davis/Blessing incident "no intentional blow was struck in a malicious manner". The Commission dismissed this as not being a rational basis for a distinction.

According to the Commission, both Kelley and Davis acted intentionally. Both applied physical force to another employee which resulted in an injury to that employee. Sollars received a swollen lip. Blessing received bruises on her arm and a "sprained ankle". Moreover, the Commission reasoned, if Kelley acted with "malice", Davis did also. Kelley's intentional act was provoked or precipitated by Sollars telling him to "shut his black mouth". Davis' action was provoked or precipitated by Davis believing Blessing was a liar, evidenced by his calling her a "lying bitch" before he pulled her arm. If "malice" were the distinguishing characteristic, the Commision reasoned, the record shows Davis acted with equal if not greater malice than Kelley. Fighting, the Commission concluded, may be a compelling basis for discharge, but it does not lessen the illogical inconsistency of retaining a guilty employee of one color while discharging those of another.

We have reviewed the Commission's findings and conclusions within our limited constraints. The findings are precise and the reasoning is carefully constructed. However, we find both the findings and reasoning fatally flawed.

We question the Commission's reasons for crediting Blessing. "Given Blessing's demeanor and her lack of interest in the outcome of this case", the Commission noted, "her version of the facts is highly credible". Concluding Blessing was a disinterested witness is strange, to say the least. At the time of her testimony, Blessing had been discharged by Sherwood for absenteeism. Although Blessing had been warned more than once about her absenteeism, she felt it was unfair she was discharged because of it. She filed a grievance with her Union about the discharge, and, then, because of what she perceived to be inaction on the part of the Union, she filed a claim against the Union with the NLRB. Com-

mon sense would seem to dictate that Blessing's discharge would more likely make her a biased witness against Sherwood than a disinterested witness. As a matter of fact, when the Attorney General objected to Sherwood's counsel cross-examining Blessing about her then existing employment status, the hearing examiner overruled the objection after Sherwood's counsel explained these questions were for impeachment purposes. However, this is a credibility determination, and we must defer to the Commission's determination of credibility.

Crediting Blessing's testimony at trial, however, misses the mark. The essential question here is what Taylor knew about the Davis/Blessing incident at the time Davis was suspended. Thus, Blessing's description of the incident at the time of trial is only relevant to the extent it squares with the description of the incident she and others made at the time of the incident, or at least, up until Davis was suspended. Blessing's description of the incident at the hearing differs significantly from the description available to Taylor at the time of the incident.

As previously noted, at the hearing, Blessing's credited description of the Davis/Blessing incident was: Davis confronted Blessing, became angry, called her a "lying bitch", grabbed her arm and pulled her toward him. Because of the pull Blessing "tripped over" a hydraulic lift on the floor, and "sprained" her ankle. Davis pulled Blessing with sufficient force to propel her eight feet away against a "skid". Her arm was bruised where Davis grabbed her, and her hands were scratched from hitting the "skid". Her "sprained" ankle kept her off work for four days.

At the hearing, Taylor recalled what he was told differently. According to Taylor, Blessing told him Davis grabbed her, pulled her toward him, she stumbled "against something", the two had a discussion and then they went their separate ways.

Blessing's detailed description of the incident given at the hearing differs significantly from the information the record shows Taylor had available at the time the incident occurred. Just after the incident occurred, Blessing said, she told the foreman, Mike King, "what happened". At the hearing, however, she did not say just exactly what she told King. There is simply nothing in Blessing's testimony which indicates what she told King, and, except for Taylor's testimony, there is nothing in the record showing what King did tell or might have told Taylor. Blessing did not remember whether she talked to Taylor. She said it was either him or another man that "she had to fill out [her report] with".

This report was a written statement made at the time of the incident. In it, Blessing described the incident:[3]

> I had repeated what John Davis had said to me, to whom he had said these things about. I was in the tubing Dept, with the girl whom was talked about and John Davis walked bye. Tammy Alders asked him about it. He looked at me and call me a "lying bitch", then grabbed my arm and threw me acrossed the hall into a skid that was there. And then I called Mike King. (verbatim)

In this statement, there are no operative facts specific enough to show the severity or aggravation of Davis' conduct. The extent of Blessing's injuries—her bruise and scratches—are not reflected in the report. The distance she was propelled—eight feet—was calculated by the hearing officer from testimony she elicited from Blessing at the hearing. Blessing's ankle, "injured" in the Findings of Fact and "sprained" in the Conclusions of Law, was not even mentioned in Blessing's report. Admittedly, Blessing did testify she was off work for four days because of her ankle injury. But on the claim form for Sherwood's "Employee Benefit Plan" filed by Blessing March 26, 1981, she stated she "fell off [the] porch and sprain[ed] [her] ankle and rehurt

---

**3.** The statement is dated "3/20/81". At the hearing, Blessing said she signed this statement "four days" after the incident, which, according to her testimony, would make the date of the incident: 3/16/81. Sherwood's pleadings and memoranda refer to the date of the incident as 3/19/81. No objection to these documents were made.

it in an accident at work". Although not crystal clear, Blessing, in the claim form, is attributing her sprained ankle to a fall from her porch and not as a result of Davis' conduct. Considered together, this record does not establish Taylor could have known the physical effects of Davis' conduct and, thus, does not serve as a reasonable basis to infer Taylor knew the "violence" of Davis' conduct.

The violence of Kelley's and Davis' conduct, however, is an essential, or, at least, critical element of the Commission equating the Kelley/Sollars incident to the Davis/Blessing incident. Arguably, Taylor's investigation prior to suspending Davis was substandard or incomplete. But there is no evidence to support this argument and Kelley does not complain Taylor's investigation of the Kelly/Blessing incident was substandard or incomplete because of race. Taylor's reasons for suspending Davis square with Blessing's description of the incident made by her in her written report. That was the information Taylor had at the time he suspended Davis. The extent of this information cannot be changed by Blessing's subsequent testimony at the hearing. Thus, there is no reason for the Commission to find a conflict between Blessing's description made at the time of the incident and Taylor's understanding, at that time, of what took place. In short, the Commission's crediting of Blessing's testimony at the hearing and not Taylor's testimony is irrelevant to the critical issue.

Moreover, even if we accept the Commission's facts, we cannot accept its reasoning. The Commission equates Kelley's conduct of hitting Sollars in the face with the resulting bloodied and swollen lip to Davis' conduct of pulling Blessing with the resulting sprained ankle, bruised arm and scratched hands. What the Commission fails to do in its equation, however, is to separate conduct from result and then separately compare the conduct in each incident and the results in each incident.

Insofar as conduct is concerned, it is sensible to infer Kelley's conscious objective was to hit Sollars in the face and to infer he was aware he was hitting her in the face. It is equally sensible to infer Davis' conscious objective was to pull Blessing and to infer he was aware he was pulling her. Kelley's hitting Sollars in the face also supports the sensible inference his conscious objective was either to damage her face or he was aware his conduct was practically certain to cause the damage it did. However, it takes a free leap rather than a sensible inference to conclude Davis pulled Kelley with the conscious objective to cause her to sprain her ankle, bruise her arm and scratch her hand or to conclude Davis was aware his pull was practically certain to cause this result. Quite simply, even accepting the Commission's facts, the intents of Davis and Kelley do not equate and, thus, the two incidents do not and cannot be made to do so.

We find no substantial evidence to support the Commission's decision. Judgment affirmed.

KELLY, and CRIST, JJ., concur.